UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

№ 06-CV-3461 (JFB) (ETB)

———————————

SEA TOW SERVICES INTERNATIONAL, INC.,

Plaintiff,

VERSUS

DUKE PONTIN, D/B/A SPIRIT TOWING D/B/A SEA TOW FLORIDA KEYS, AND DUKE PONTIN, INDIVIDUALLY,

Defendants.

———————————

**MEMORANDUM AND ORDER**
March 16, 2009

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Sea Tow Services International, Inc. ("Sea Tow") brings this action against defendants Duke Pontin, doing business as Spirit Towing ("Spirit") and Sea Tow Florida Keys (collectively, "defendants" or "Pontin"), as well as Duke Pontin individually, asserting claims in trademark under federal and common law, and breach of restrictive covenant, unfair competition and breach of contract under common law, arising from the termination of a licensing agreement ("the Agreement") between Sea Tow and Pontin. Specifically, plaintiff claims that Pontin's continued use of plaintiff's protected trademark, as well as his continued operation of a marine towing business after the valid termination of the Agreement, violated the Agreement and plaintiff's intellectual property rights. Defendant, in turn, challenges the validity of the termination and counter-claims for breach of contract.

During the course of this litigation, defendants have filed a motion to dismiss, as well as a motion to stay the action pending the outcome of litigation ongoing between the parties in Florida state court. The Court denied the motion to dismiss on January 18, 2007[1] and denied the motion to stay on April

---

[1] *Sea Tow Services Int'l, Inc. v. Pontin*, 472 F. Supp. 2d 349 (E.D.N.Y. 2007).

17, 2007.[2] Familiarity with those decisions is presumed.

Defendants now move for summary judgment on plaintiff's trademark-related claims and defendants' breach of contract counter-claim. Plaintiff, in turn, cross-moves for summary judgment on all of its claims and on defendants' counter-claim. For the reasons set forth herein, the Court finds that genuine issues of disputed fact regarding defendants' ability to "cure" violations of the Agreement within the allotted time period, which led to the contract's dissolution, preclude summary judgment on plaintiff's breach of contract claim and defendants' breach of contract counter-claim. Moreover, because plaintiff's other claims necessarily rest upon a finding by this Court that the Agreement was properly terminated as a matter of law, the parties' cross-motions as to those other claims are also denied in their entirety.

I. BACKGROUND

A. Facts

The Court has taken the facts described below from the parties' affidavits and exhibits, defendants' and plaintiff's Local Rule 56.1 Statement of Facts filed, respectively, in support of and in opposition to defendants' motion for summary judgment ("Defs.' 56.1" and "Pl.'s 56.1") and plaintiff's and defendants' Local Rule 56.1 Statement of Facts filed, respectively, in support of and in opposition to plaintiff's cross-motion for summary judgment ("Pl.'s Cross 56.1" and "Defs.' Cross 56.1").[3]

Plaintiff Sea Tow, through one hundred franchisees and licensees, provides twenty-four hour on-call services to the boating communities along the continental United States, as well as locations in Mexico, Canada, Australia, parts of Europe and the Caribbean. (Frohnhoefer Decl. ¶ 3.) In September of 1983, Sea Tow registered its name as well as its trade dress of the color yellow and/or yellow and black lettering on its vessels' hulls with the United States Patent and Trademark Office. (*Id.* ¶¶ 3, 5-6.) Plaintiff's network is supported by Franchise or License Agreements between it and each of its franchisees/licensees which permit those entities to provide nautical services in geographically-distinct locations, employing plaintiff's name and marks. (*Id.* ¶ 11.)

Pontin is the owner and sole-proprietor of Spirit Towing f/d/b/a Sea Tow Services Florida Keys. (Pontin Decl. dated April 15, 2008 ¶ 2.) On July 24, 1992, plaintiff and defendants entered into the Agreement, providing defendants with an exclusive "license to use the Marks and Know How for marine assistance, transportation and environmental services" in a specific geographic area. (Frohnhoefer Decl., Ex. B ¶ 1(A-B).)[4]

---

[2] *Sea Tow Services Int'l, Inc. v. Pontin*, No. 06-CV-3461 (JFB) (ETB), 2007 WL 1135601 (E.D.N.Y. Apr. 17, 2007).

[3] Unless otherwise noted, facts described herein are undisputed between the parties.

[4] "Marks" are defined as "the SEA TOW names, marks, phrases, trade dress (yellow and yellow and black) and logos." (Frohnhoefer Decl., Ex. B at 1.) "Know How" is defined as "a body of confidential business information and trade secrets." (*Id.*)

2

Paragraph 2 of the Agreement states, in relevant part:

> In order to enable SEA TOW to maintain control over the nature and quality of all services . . . and for the protection of the public and the preservation of SEA TOW's rights, SEA TOW is hereby granted the right to examine and approve the quality of services and products . . . . In particular, Licensee shall conform to the requirements in the annexed Appendix . . . . SEA TOW shall also have the right to examine and approve the manner in which Licensee uses the Marks and Know How and provides services, to insure proper usage of the Marks and know-how by the Licensee. Should SEA TOW reasonably object to Licensee's unauthorized use of the Marks or know-how or the quality of services rendered, Licensee shall forthwith cure such reasonable objections. If Licensee fails to cure any reasonable objections made by Licensor within ten (10) days after being notified of the objection, SEA TOW shall have the right at its option to terminate this Agreement pursuant to Paragraph 9.

(*Id*. ¶ 2.) Paragraph 9(B)(I-V) states, in relevant part:

> Because of the value of the Marks and the associated good will, and the danger flowing from lack of quality control or use by a financially disabled party, this Agreement shall automatically and immediately terminate, subject to the cure provisions set forth in paragraph 2, in the event of any of the following:
>
> Any attempt by Licensee to assign or otherwise transfer part or all of this Agreement or any rights granted under this Agreement without the prior written consent of Licensor;
>
> The substantial cessation of Licensed Business by the Licensee . . . .
>
> Breach of the duty to use best efforts . . . .
>
> Failure to cure a substantial default, specifically including reasonable quality control objections under paragraph 2;
>
> If Licensee files a petition under any provision or chapter of any bankruptcy or insolvency laws, or is adjudicated a bankrupt, or if a petition in bankruptcy is filed against Licensee, or if it becomes insolvent or makes an assignment for the benefit of its creditors or any arrangement pursuant to any bankruptcy law, or if Licensee discontinues its business, or if

3

a receiver is appointed for it or its business.

(*Id.* ¶ 9(B).) Paragraph 11 states that:

> Upon the lawful termination of this Agreement . . . Licensee . . . shall immediately discontinue the use of each and every SEA TOW right, including the SEA TOW Marks and trade dress . . . and all SEA TOW Know How . . . .

(*Id.* ¶ 11.) Paragraph 18 provides that:

> Any notice, payment or statement required by this Agreement shall be in writing and either delivered personally or sent by overnight courier or certified mail "return receipt requested," postage prepaid . . . . All notices shall be effective as of the date of personal delivery or five days after such mailing.

(*Id.* ¶ 18.) Finally, paragraph 7 of the Appendix, at page 13 of the Agreement, states that:

> All Licensees and employees will, as required by law, be Coast Guard Licensed and have the required Assistance Towing endorsement on their License if they are to be the Master of any towing vessel performing services hereunder.

(*Id.* at 13, ¶ 7.)[5]

Pontin's United States Coast Guard ("Coast Guard") License expired on July 17, 2005 and was renewed on October 6, 2006.[6]

---

[5] The Agreement further includes a paragraph in the Appendix which states that the Licensee shall "refrain from being engaged in or have ownership of other businesses that compete with SEA TOW or which provide marine assistance or transportation during the time of this License and for a period of time thereafter . . . ." (Frohnhoefer Decl., Ex. B at 17 ¶ 1.) However, the Appendix also includes a paragraph detailing the parameters of the non-competition clause, which is crossed out and initialed by the parties. (*Id.* at 18.) The parties dispute defendants' obligations related to these provisions, which are dispositive to plaintiff's claims of breach of restrictive covenant and unfair competition. Because disputed issues of material fact regarding the validity of plaintiff's termination of Agreement preclude summary judgment on the breach of contract claim, though, the Court need not address these claims at this stage of the proceedings, because they necessarily depend upon a ruling on the contract claim.

[6] Defendants submit, in contesting plaintiff's assertion that Duke Pontin was unlicensed between July 17, 2005 and October 6, 2006, that pursuant to 46 C.F.R. § 10.209 (2008), "the Coast Guard gives captains a one-year grace period to renew captain licenses, which are then valid for five years at a time." Although defendants have accurately related the statutory language, the suggestion inherent in its use, that somehow Duke Pontin's license was actually valid a year after its expiration, is patently false. Under the relevant federal regulation, individuals renewing their licenses are given one year from the date of expiration to do so before they become new applicants. However, "[t]he 12 month period of grace, and any extension, do not affect the expiration date of the license. A license is not valid for use after the expiration date." *Id.* § 10.209(e)(1). Further, defendants submit that Pontin renewed his license "on or about July 11,

(Pl.'s Cross 56.1 ¶ 15.) Pontin's son, Cove Pontin, was unlicensed by the Coast Guard prior to July 18, 2006. (*Id.* ¶ 16.) Defendants operated vessels and provided services to Sea Tow members without having a captain aboard with a valid Coast Guard license.[7] (*Id.* ¶ 17.)

On May 23, 2006, Coast Guard LTJF Chad Robuck sent an electronic mail message to Coast Guard CDR Gwen Keenan and Coast Guard LT Daniel Silvestro with the subject line: "FW: Pontin, Cove," regarding the fact that Cove Pontin was, at the time, an unlicensed operator. (Frohnhoefer Decl., Ex. E.) The e-mail stated as follows: ". . . the best way to handle the situation would be contacting Sea Tow Corporate and letting them know that Cove [Pontin] does not have a license . . . . [I]n order to prevent a possible violation of law or, heaven forbid, major casualty, we believe it is in the best interest of Sea Tow Corporate to be aware of the situation." (*Id.*)

By letter dated June 26, 2006 and entitled "Notice of Termination - EFFECTIVE IMMEDIATELY," Sea Tow informed the defendants of the following: "your recent failures to satisfy the mandates of the July 24, 1992 License Agreement are incurable, leaving us no choice but to part ways." (Frohnhoefer Decl., Ex. D.) The letter specifically mentioned, as an "incurable violation," "[e]mploying operator(s) (including, for example, your son Cove Pontin) who does not even have a United States Coast Guard License yet has operated as if he did providing commercial assistance in direct violation of the [Licensing Agreement] . . . and certainly the law and common sense exposing everyone to an incurable risk of liability . . . ."[8] (*Id.*)

By letter dated July 11, 2006, counsel for defendants challenged Sea Tow's attempt at intermediate termination of the Agreement on the grounds that "[Sea Tow] did not and never has, provided [defendants] with the required written notice that delineated the precise nature of the reasonable objection and that delineated the allotted grace period to cure the alleged reasonable objection." (Frohnhoefer Decl., Ex. G, at 2.) Defendants charge that soon thereafter, Sea Tow removed them from its website, ceased dispatching Sea Tow marine assistance calls to them and authorized and dispatched alternative Sea Town licensees/franchisees into their Area of

---

2006." (Defs.' Cross 56.1 ¶ 15.) However, as stated *infra*, whether Pontin renewed his license on July 11, 2006 or October 6, 2006 is irrelevant to the case at bar, as it is undisputed that he was unlicensed immediately prior to June 26, 2006, the date on which plaintiff purported to terminate the Agreement.

[7] Pontin denies this assertion "to the extent that not all marine assistance calls require the individual operating the vessel to hold a Coast Guard captain's license." (Def.'s Cross 56.1 ¶ 17.) Regardless, defendants have conceded that Duke and Cove Pontin did perform, as unlicensed captains, marine operations which required a license prior to the June 26, 2006 termination letter. Specifically, Duke Pontin notes that he "inadvertently performed six tows before realizing that his license had expired" in early July of 2006. (*Id.* ¶¶ 17, 19.)

[8] Defendants stress that the lapse of "[Duke] Pontin's license was *not* one of the reasons stated in Sea Tow's letter dated June 26, 2006 as a basis of termination under the License Agreement," (Defs.' Cross 56.1¶ 30), but the letter at issue clearly describes the violation as "[e]mploying operator(s)" not in possession of a valid license. The Court finds that the term "operator(s)" unambiguously encompasses Duke Pontin.

Responsibility as defined by the Agreement. (Defs.' 56.1 ¶ 15.) Sea Tow submits that it "sought to protect its membership and the public from the illegal use of unlicensed captains by a terminated provider." (Pl.'s 56.1 ¶¶ 15-16.)

Defendants performed approximately thirty marine assistance calls within the Area of Responsibility between June 26, 2006 and August 25, 2006.[9] (Def.'s 56.1 ¶ 17.) On July 25, 2006, defendants filed a motion for a preliminary injunction in Florida state seeking to enforce the Agreement between the parties.[10] (Weinstein Decl. dated April 15, 2008, Ex. D.) On August 26, 2005, the Florida court granted defendants' motion pending a full adjudication on the merits regarding Sea Tow's purported June 26, 2006 termination. (*Id.*) By letter dated August 31, 2006, Sea Tow requested that Pontin produce evidence, within ten days, that all employees who had captained vessels were properly licensed. (Frohnhoefer Decl., Ex. N.) On September 13, 2006, Sea Tow moved to dissolve the temporary injunction, and on November 28, 2006, the Florida court modified the injunction in part but did not alter its August 26, 2006 determination that Sea Tow's June 26, 2006 notice of termination was temporarily of "no force nor effect." (Weinstein Decl. dated April 15, 2008, Ex. E.) This injunction was subsequently dissolved by the Third District Court of Appeals for the State of Florida, which stated that it should have been dissolved by September 10, 2006, ten days after Sea Tow sent Pontin the letter requesting proof of licensed captains, which Pontin failed to provide. (*Id.*, Ex. F, at 4-5.) On February 14, 2008, the Third District Court of Appeals denied Pontin's motion for a rehearing. (*Id.*, Ex. G.) Pontin held himself out as a Sea Tow

---

[9] The Court notes that plaintiff filed its complaint in the instant action on July 14, 2006 and therefore, cannot seek relief for events which occurred thereafter. Though counsel for plaintiff contends that the decision of the Third District Court of Appeals regarding the preliminary injunction entered by the Florida state court constitutes a *res judicata* determination of the issues presented, (see Oral Argument Transcript ("Tr.") at 17-18), the Court disagrees. As that decision addresses the validity of plaintiff's Notice of Termination letter mailed to defendants on August 31, 2008, well over a month after the instant complaint was filed, it has no effect on whether plaintiff's June 26, 2006 Notice of Termination letter was valid, which is the subject matter of the case at bar. Plaintiff could have moved to amend its complaint to incorporate factual allegations post-dating July 14, 2006, but opted not to do so. Accordingly, for purposes of adjudicating the parties' motions, the Court confines its application of the law to the facts alleged in plaintiff's complaint and defendants' counter-claim, filed on July 17, 2006 and June 15, 2007, respectively.

[10] The Court may take judicial notice of documents filed in the Florida action and orders issued by the state court in that action, not for the truth of the matters asserted therein but to establish the fact of such filings or orders. *See Washington v. United States Tennis Ass'n*, 290 F. Supp. 2d 323, 326 (E.D.N.Y. 2003) (A court is "permitted to take judicial notice of court documents from previous actions."); *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 425 F. Supp. 2d 484, 508 n.16 (S.D.N.Y. 2006) (noting that "the Court properly can take judicial notice of the filings and [an] Order in the Connecticut state court action") (citing *Green v. Warden, U.S. Penitentiary*, 699 F.2d 364, 369 (7th Cir. 1983) ("[F]ederal courts may also take notice of proceedings in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to matters at issue.")).

licensee until that date. (Pl.'s Cross 56.1 ¶ 32.)

Plaintiff asserts that, in order to obtain or renew a Coast Guard license, an applicant must log sufficient "sea time" days of service, pass a formal examination and submit to a full background check, which takes approximately six months to conduct, and therefore, "[o]n June 26, 2006, it was impossible for defendants to cure their prior unlicensed operation of vessels for the provision of marine assistance within ten days." (Pl.'s Cross 56.1 ¶¶ 22-24.) Defendants dispute the process of application or renewal of a license as described by plaintiff. (Defs.' Cross 56.1 ¶¶ 22-23.) Defendants further submit that "[w]hen Pontin realized in early July 2006 that he needed to renew his captain's license he immediately stopped operating any boats. At that time, Pontin had provided Sea Tow with license information for three or four other captains that immediately took over calls on his behalf." (*Id.* ¶ 24.)

### B. Procedural History

On July 14, 2006, plaintiff filed the instant action. On September 29, 2006, defendants moved to dismiss all claims. By Memorandum and Order dated January 18, 2007, this Court denied defendants' motion to dismiss in its entirety. On January 29, 2007, defendants moved to stay this action pending the resolution of ongoing litigation in the State of Florida. The Court, by Memorandum and Order dated April 17, 2007, denied defendants' motion. On June 15, 2007, defendants filed their first amended answer to plaintiff's complaint and counter-claimed for breach of contract. On June 29, 2007, plaintiff answered defendants' counter-claim. Defendants moved for summary judgment on April 15, 2008. Plaintiff filed its opposition to defendants' motion and cross-moved for summary judgment on May 15, 2008. On May 30, 2008, defendants filed a reply in support of their motion and an opposition to plaintiff's cross-motion. On June 13, 2008, plaintiff filed a reply in support of its cross-motion. Oral argument was heard on July 29, 2008. This matter is fully submitted.

### II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving

party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

### III. DISCUSSION

Defendants argue that summary judgment is warranted dismissing plaintiff's trademark-related claims because the viability of such claims necessarily rests upon a valid termination of the Agreement between the parties, which defendants submit did not occur, making plaintiff liable for breach of contract. Plaintiff, in turn, argues that the June 26, 2006 immediate termination of the Agreement was valid in the absence of a ten day opportunity to cure because defendants' violations were "incurable" as a matter of law. Therefore, plaintiff contends that, because the termination of the Agreement was valid, defendants' use of the Sea Tow mark and Know How post-termination violated plaintiff's protected trademark and, further, defendants' continued operation of a marine towing business violated the contract's restrictive covenant provision and amounted to unfair competition. However, because disputed issues of material fact exist regarding whether plaintiff properly terminated the Agreement that cannot be decided on summary judgment, and the success or failure of plaintiff's claims and defendants' counter-claim for breach of contract necessarily depends upon the resolution of that disputed issue, the Court denies the parties' respective motions for summary judgment in their entirety.

### A. The "Cure" Provision

As a threshold matter, plaintiff first argues that the Court should "interpret paragraph 9 [of the Agreement] in accordance with its language, which *does not* require that *every* instance of breach requires notice." (Plaintiff's Memorandum of Law, at 11.) For the reasons stated below, the Court disagrees and finds that the plain language of the contract did require that plaintiff provide defendants with a ten day opportunity to cure.

### 1. Legal Standard

An unambiguous contract contains language that has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (internal quotation marks and

citations omitted). In other words, "[a] contract is not ambiguous where there is no reasonable basis for a difference of opinion." *Red Rock Commodities v. Standard Chartered Bank*, 140 F.3d 420, 424 (2d Cir. 1998). "The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." *Omni Quartz v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002). However, "when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) (citation and internal quotation marks omitted). "Whether a contractual provision is ambiguous is a threshold question of law to be determined by the court. If a court determines that a contractual provision is ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Ocean Partners, LLC v. N. River Ins. Co.*, 546 F. Supp. 2d 101, 110 (S.D.N.Y. 2008) (citation and internal quotation marks omitted). Further, the court may "consider extrinsic evidence such as the parties' course of conduct throughout the life of the contract." *N.Y. State Law Officers Union v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006). Courts have specifically held that "[w]here the contractual language is subject to more than one reasonable meaning and where extrinsic evidence of the parties' intent exists, the question of the proper interpretation should be submitted to the trier of fact." *TeeVee Toons, Inc. v. DM Records, Inc.*, No. 05 Civ. 5602 (JGK), 2007 WL 2851218, at *6 (S.D.N.Y. Sept. 27, 2007) (collecting cases).

2. Application

The applicable provisions of the Agreement state as follows:

> . . . SEA TOW is hereby granted the right to examine and approve the quality of services and products, including membership lists and records. In particular, Licensee shall confirm to the requirements in the annexed Appendix . . . . Should SEA TOW reasonably object to Licensee's unauthorized use of the Marks or know-how or the quality of services rendered, Licensee shall forthwith cure such reasonable objections. If Licensee fails to cure any reasonable objections made by Licensor within ten (10) days after being notified of the objection, SEA TOW shall have the right at its option to terminate this Agreement pursuant to Paragraph 9.

(Frohnhoefer Decl., Ex. B ¶ 2.)[11] Paragraph 9 states, in turn, that:

> Because of the . . . danger flowing from lack of quality control . . . this Agreement shall automatically and immediately terminate, subject to the cure provisions set forth in paragraph 2, in the event of . . . [b]reach of the duty to use

---

[11] The Appendix requires that "[a]ll Licensees and employees will, as required by law, be Coast Guard Licensed."

9

best efforts [or] . . . [f]ailure to cure a substantial default, specifically including reasonable quality control objections under paragraph 2.

(*Id.* ¶ 9(IV)(B) (emphasis added).)

Plaintiff thus argues that "the duty to give notice and an opportunity to cure only relates to 'reasonabl[e] object[ions]' to Pontin's 'unauthorized use of the Marks or Know How or the quality of services rendered' not to conformity with the Appendix A license requirement." (Plaintiff's Memorandum of Law, at 11.) Plaintiff further contends that the Court that the phrase "'this Agreement shall automatically and immediately terminate' means in plain language, and by the intent of the parties, that incurable violations, like those of Appendix A for using unlicensed captains, attempts to assign, business cessation, failure to use best efforts, bankruptcy, and failure to cure after being given notice of a trademark issues *do not even need notice for the agreement to automatically and immediately terminate . . . .*" (*Id.* (citations omitted) (emphasis in original).)[12]

The Court rejects this strained and errant interpretation, which, in essence, omits the clause "subject to the cure provisions set forth in paragraph 2" from the language of paragraph 9. If *only* the trademark-related violations of the Agreement required the ten-day cure provision, then paragraph 9 would have so specified, rather than stating that the cure provision of paragraph 2 applied to termination based on trademark-related violations, quality control issues, attempts to assign, business cessation, failure to use best efforts and bankruptcy. Further, paragraph 2 states that, pursuant to their obligations regarding quality of services, Licensees "shall conform to the requirements in the annexed Appendix." The paragraph goes on to state that the Licensee is entitled to an opportunity to cure should Sea Tow object to the quality of services rendered before it may terminate the Agreement, pursuant to paragraph 9. Paragraph 9, in turn, states that the "[f]ailure to cure a substantial default, specifically including reasonable quality control objections under paragraph 2" warrants termination, subject to the cure provisions of paragraph 2.

---

[12] Counsel for plaintiff reiterated this point at oral argument, stating:

> Nowhere in this Paragraph 2 does it delineate the automatic termination in Paragraph 9(B). Nor does it say that Paragraph 9(B)'s explicit language is somehow limited only to the termination based upon the four paragraphs . . . . The Paragraph 2 deals with trademarks. The inherent purpose is clear on its face. Look at 9(b). Look at any attempts to assign without consent . . . . That's not in the cure provision of the paragraphs nor would it ever be. This states an attempt to assign without consent. That is an automatic termination.

(Tr. at 24-25.) This position is untenable; using counsel's example of assignment attempts, the Court notes that paragraph 9 of the Agreement specifically reads as follows: ". . . this Agreement shall automatically and immediately terminate, subject to the cure provisions set forth in paragraph 2, in the event of any of the following: Any attempt by Licensee to assign . . . ." (Frohnhoefer Decl., Ex. B ¶ 9(B)(I).) The plain language leaves no doubt that assignment attempts are violations subject to the cure provision.

10

Accordingly, based upon the unambiguous language of the Agreement, any termination for the violation of the Appendix requirements is necessarily subject to the cure provision of the contract. Moreover, because the contract is unambiguous in this regard, any consideration of extrinsic evidence regarding the intention of the parties that would be reserved to the trier of fact is unnecessary. However, as stated *infra*, if Pontin's failure to secure licensed captains in the maintenance of his operation was not a curable violation, plaintiff would have been entitled to terminate the Agreement immediately despite the application of this cure provision. Thus, the Court will next turn to the issue of curability.

### B. Curability

Plaintiff argues that it was not required to abide by the Agreement's cure provision because any attempt to cure the violation, *i.e.*, defendants' use of unlicensed captains, would have been futile. Defendants submit that the cure provision must be followed regardless of whether the breach is incurable.[13] For the reasons set forth below, the Court finds, as a matter of law, that if the breach was incurable, plaintiff was under no obligation to adhere to the ten-day cure provision; however, there remain genuine issues of material fact regarding curability.[14] Therefore, summary judgment on plaintiff's and defendants' respective breach of contract claims, and

---

[13] Defendants cited no case law in support of this proposition, but rather stated the following, in a colloquy with the Court during oral argument:

> THE COURT: Let me just ask you, on the issue of curable and not curable . . . if something is incurable, your position is that [plaintiff] still ha[s] to wait the ten-day period, even if it's clearly under the circumstances incurable? Doesn't the law say if something is clearly incurable that the party need not wait regardless of what the contract says at that point?
>
> COUNSEL: I respectfully say, no, the law does not say that.

. . .

> THE COURT: Suppose [a cure] is impossible, though . . . [and] relates to a matter of public safety. So fundamental to the contract, that to allow a breach to continue for ten days that jeopardizes the public is not something that they need to do . . . . In other words, if your client was using . . . vessels that were not seaworthy, that could sink . . . . Do you have to wait ten days and allow those vessels to operate and endanger the public?
>
> COUNSEL: . . . [T]hey do have to [wait], pursuant to the contract provisions, they have to provide an opportunity to cure it.

(Tr. at 6-8.) As stated *infra*, the Court rejects defendants' argument as an inaccurate statement of controlling law, which, in limited circumstances, permits a party to terminate a contract without providing the breaching party with an opportunity to cure.

[14] In fact, in response to questioning from the Court at oral argument, counsel for defendants acknowledged that disputed issues of fact existed in connection with the curability issue. (Tr. at 9 ("THE COURT: Isn't it an issue of fact, the issue of whether or not it was possible or not impossible to cure under these circumstances . . . ? Why shouldn't that just go to a jury to decide as an issue of fact? COUNSEL: I believe it is an issue of fact."); *see also id.* at 12.)

plaintiff's other claims (which are all contingent upon the resolution of that issue) must be denied.

### 1. Legal Standard

It is well-settled that "'[u]nder New York law, . . . where the Agreement specifies conditions precedent to the right of cancellation, the conditions must be complied with.'" *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 727 (2d Cir. 1992) (quoting *Consumers Power Co. v. Nuclear Fuel Servs., Inc.*, 509 F. Supp. 201, 211 (W.D.N.Y. 1981)). "Generally, a party asserting nonperformance must afford a defaulting party any contractually-secured opportunity to cure prior to terminating a contract." *Point Prods. A.G. v. Sony Entertainment, Inc., et al*, No. 93 Civ. 4001 (NRB), 2000 WL 1006236, at *3 (S.D.N.Y. July 20, 2000) (internal quotation and citations omitted). However, in "limited circumstances, New York law permits a party to terminate a contract immediately, without affording the breaching party notice and opportunity to cure. Such circumstances include . . . when the misfeasance is incurable and when the cure is unfeasible." *Needham v. Candie's, Inc.*, No. 01 Civ. 7184 (LTS) (FM), 2002 U.S. Dist. LEXIS 15144, at *11-*12 (S.D.N.Y. Aug. 19, 2002); *aff'd*, 2003 U.S. App. LEXIS 7906 (2d Cir. Apr. 22, 2003) (internal citations omitted).

Accordingly, adherence to the cure provision of a contract is not required where it would be a futile act. *See, e.g., Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991) (plaintiff waived entitlement to two day opportunity to cure by constructively abandoning project with "high-handed demands for arbitration or additional payments"); *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 519 (2d Cir. 1989) (reversing district court's determination that compliance with cure provision was unwarranted on the grounds that the evidence demonstrated that a potential cure was "far from futile"); *Point Prods. A.G.*, 2000 WL 1006236, at *3 (S.D.N.Y. July 20, 2000) ("[p]roviding notice and cure is not required where it would be futile"); *Delvecchio v. Bayside Chrysler Plymouth Jeep Eagle, Inc.*, 706 N.Y.S.2d 724, 726 (N.Y. App. Div. 2000) (contract did not require that defendants give plaintiff an opportunity to cure a breach, but "for the most part, his alleged misfeasance was not, in any event, curable. Thus . . . notice was not a material term of the contract."); *Hicksville Mach. Works Corp. v. Eagle Precision, Inc.*, 635 N.Y.S.2d 300, 302 (N.Y. App. Div. 1995) (plaintiff not required to provide defendant with opportunity to cure where cure was impossible); *Allbrand Discount Liquors, Inc. v. Times Square Stores Corp.*, 399 N.Y.S.2d 700, 701 (N.Y. App. Div. 1977) (stating that "[o]nce it becomes clear that one party will not live up to the contract, the aggrieved party is relieved from the performance of futile acts . . . ."), *appeal denied*, 44 N.Y.2d 642 (N.Y. 1978).

Courts in this district have further held that "[t]he reason that [a party] [i]s entitled to rescind [an] agreement, despite the [cure provision], is found in the common law contract principle that holds that a material breach that goes to the root of the matter or the essence of the contract constitutes grounds for rescission without opportunity to cure." *Southland Corp. v. Froelich*, 41 F. Supp. 2d 227, 246 (E.D.N.Y. 1999) (citing *Southland Corp. v. Mir*, 748 F. Supp. 969 (E.D.N.Y. 1990)). This principle essentially restates the holding of New York courts that misfeasance which is incurable warrants termination without an opportunity to cure. In the instant

matter, whether or not this exception applies to defendants' alleged misfeasance is a very fact-specific determination, that requires, among other things, an analysis upon the nature of the misfeasance, including whether or not public safety was implicated by defendants' failure to man its marine vessels with licensed captains.

2. Application

As stated *infra*, it is clear, as a matter of law, that the Agreement between plaintiff and defendants unambiguously required that plaintiff provide defendants with a ten-day window to cure any stated violations of the contract. Moreover, it is undisputed between the parties that, in its June 26, 2006 letter purporting to terminate the Agreement, plaintiff failed to abide by that contractual provision. Plaintiff argues that its termination of the Agreement was valid in the absence of the opportunity to cure because defendants' violation of the Agreement, *i.e.,* the use of unlicensed captains, went to the "very heart of the agreement to provide proper services, . . . threaten[ed] public health and safety and [wa]s incurable, the harm suffered by the Sea Tow Network and its Trademarks would [have] be[en] irreparable and impossible to fix, and hence any notice would [have] be[en] futile." (Frohnhoefer Decl. ¶ 19(g).) Moreover, according to plaintiff, any such cure would have been unfeasible in the allotted ten day window. As to the latter argument, plaintiff submits that: both Duke Pontin and Cove Pontin were unlicensed operators as of June 26, 2006 and in order to obtain or renew a Coast Guard license, an applicant must log sufficient "sea time" days of service, pass a formal examination and submit to a full background check, which takes approximately six months to conduct. Therefore, plaintiff alleges that "[o]n June 26, 2006, it was impossible for defendants to cure their prior unlicensed operation of vessels for the provision of marine assistance within ten days." (Pl.'s Cross 56.1 ¶ 24.) A rational fact-finder crediting plaintiff's assertions herein could thus determine that defendants' unlicensed operation of marine vessels went to the "essence" of the Agreement and/or any potential cure was not feasible within the specified time frame. Therefore, if plaintiff's evidence is credited, plaintiff would not have breached the Agreement between the parties when it purported to terminate that contract without providing defendants with the ten day window to cure.

Defendants, however, first argue that Pontin's unlicensed operation of a marine vessel posed no danger to the public safety, as he has "more than 30 years experience in this business and one of the most comprehensive captain's licenses issued by the Coast Guard." (Pontin Decl. dated May 30, 3008 ¶ 8.) Defendants further submit that the licensing issue could have been cured within ten days, had proper notice been rendered, and therefore plaintiff was not entitled to terminate the Agreement without providing that opportunity. In particular, defendants assert that as of June 26, 2006, "Cove [Pontin] had passed the Coast Guard exam to obtain his captain's license, had taken the oath, had enough years at sea, and was only waiting for the physical paperwork to go through." (Defs.' Cross 56.1 ¶ 16.) Further, defendants argue that when Duke Pontin realized that his license had expired in early July of 2006, he "provided Sea Tow with license information for three or four other captains that immediately took over calls on his behalf." (*Id*. ¶ 17.) Presumably, then, Cove Pontin could have received his license by July 6, 2006, or any one of the three or four licensed captains could have operated defendants' vessels by that time. Either way, a rational fact-finder accepting defendants' version of

events could determine that the misfeasance was curable within the ten-day window, making plaintiff's purported immediate termination a violation of the contractual terms.

Therefore, the Court finds that genuine issues of material fact regarding the "curability" of defendants' alleged misfeasance preclude summary judgment on both plaintiff and defendants' respective breach of contract claims. *See, e.g., Daiwa Special Asset Corp. v. Desnick*, No. 00 Civ. 3856 (SAS), 2002 U.S. Dist. LEXIS 16164, at *38 (S.D.N.Y. Aug. 29, 2002) (factual dispute regarding ability to cure would have precluded summary judgment had the contract at issue not been validly terminated on separate grounds); *U.S. West Fin. Serv., Inc. v. Marine Midland Realty Corp., et al*, 810 F. Supp. 1393, 1404 (S.D.N.Y. 1992) ("disputed issues of fact as to whether [breaching party] was entitled to notice of or could have cured any default" precluded summary judgment); *Lanvin, Inc. v. Colonia, Inc.*, 776 F. Supp. 125, 127 (S.D.N.Y. 1991) (summary judgment unwarranted where whether defaulting party could have cured default presented issues of fact); *1537 Assocs. v. Temlex Indus.*, 128 A.D.2d 384, 386 (N.Y. App. Div. 1987) (overturning lower court decision because "[t]riable issues of fact precluding summary judgment [we]re presented as to whether . . . a notice was not required because the [appellee's] alleged default and wrongful course of conduct constituted an incurable breach"). Similarly, the disputed issues of fact on that issue preclude summary judgment in either party's favor on plaintiff's other claims.

IV. CONCLUSION

For the reasons set forth above, defendants' motion and plaintiff's cross-motion for summary judgment on their respective breach of contract claims are denied. Moreover, because plaintiff's other claims in trademark, breach of restrictive covenant and unfair competition are contingent on an adjudication of plaintiff and defendants' breach of contract claims, the parties' respective motions for summary judgment on those other claims are also denied. In short, the cross-motions for summary judgment are denied in their entirety.

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated: March 16, 2009
Central Islip, NY

\* \* \*

The attorney for plaintiff is Mitchell A. Stein, Esq., of Stein Law, P.C., 24 Woodbine Avenue, Suite 4, Northport, New York 11768. The attorneys for defendants are Michael S. Weinstein, Esq. of Cole Schotz Meisel Forman & Leonard, 25 Main Street, Hackensack, New Jersey 07602 and Peter M. Jaensch, Esq. of Robertson Freilich Bruno & Cohen, LLC, One Riverfront Plaza, Newark, New Jersey 07102.